## FOWLER v. RATHBONES.

1. Where a ship and cargo are exposed at a particular place to a common peril of sinking, and becoming submerged in deep water, and the expense of raising and saving them from that place would be greater than if stranded in shoal water, and the master, to save them from such increased expenses, runs the ship on flats near by and strands her in shoal water, and thereby increases the peril to the ship and diminishes the damages and expenses of saving her and the cargo, then there is a "voluntary stranding" within the meaning of the law, and a case entitling the owners of the vessel to recover, as general average, their just proportion of such damages and expenses.

2. Where no water enters the ship which reaches and damages the cargo, except what comes through holes cut in the bows by the ice previously to such a case of stranding, then the owners of the cargo are not entitled to be allowed anything for the damages to their cargo by water, by way of general average, or by way of reduction of the shipowner's claim.

3. In such a case of stranding the shipowners are entitled to recover in general average only those expenses which were caused by stranding the ship, not including any occasioned by damage to the ship through the swelling of the cargo (linseed, which water swells) caused by water which entered through the holes in the bows; but if the ship was also injured by such stranding and by lying on an uneven bottom, her owners are entitled to recover the expenses for repairing *such* injuries, by way of general average, and it is for the jury to determine from the evidence what such repairs amount to.

4. Erroneous findings of the jury—assuming them to be erroneous—as to what injury the ship did suffer by the stranding and what by swelling

of the cargo, or such findings on any other matter of fact, are not sub-ject to review here.

5. Where the owners of the cargo enter, after such a case of stranding as above described, into " an average bond" whereby they agree to pay as consignees of cargo, what should be found to be due from them on their share of the cargo, for general average losses and expenses arising out of the transaction, provided such losses and expenses should be stated and apportioned in accordance with the established usage and laws of New York in similar cases, by certain average adjusters named, then if in respect to the contributory value of freight, the adjustment, as made up by the average adjusters, is according to the usage and custom of New York, and no more has been allowed for damages to the ship than was attributable to the stranding, in that case the shipowners are entitled to the amount stated in the average adjustment to be due from the owners of the cargo as their general average contribution, with in-terest from the date of the adjustment.

ERROR to the Circuit Court for the Southern District of New York.

This was an action of assumpsit, brought in the court be-low by the owners of the ship Oneiza, to recover from the defendants, as consignees and owners of cargo transported aboard of that vessel on a voyage from Calcutta to New York, a sum alleged to be due to the plaintiffs by way of a general average for losses and expenses incurred in consequence of an alleged voluntary stranding of the ship.

The facts, which appeared from the protest and the testi-mony of witnesses, were, in the main, undisputed.

The ship arrived off Sandy Hook January 16th, 1867, and anchored that night inside of the Hook. There was so much ice in the bay that she could not proceed until the 21st, when she was towed up, in the afternoon, as far as the quarantine ground and anchored there. The water was full of floating ice. The next morning it was discovered that the ship was settling by the head, and by 7 o'clock A.M. she had six feet of water in her; the leak being caused by holes broken in both of her bows by the ice. Attempts were made to free her from water by her pumps. They were, however, ineffec-tual; the water being about forty-two feet where she was anchored, and the Staten Island flats where the water was shoaler being near, the master caused the ship to be towed

a distance of three hundred yards into such water, on the flats, until she grounded on the bottom at about 8 o'clock A.M. The bottom at the place where she had been anchored was soft. What sort of bottom was at the place where she grounded—whether uneven or soft—was not clear. The evidence was not full or perhaps quite consistent, but it was submitted to the jury. At the time the ship grounded she had ten feet of water in her. If she had sunk where she had been anchored, she would have been totally submerged. A wrecking vessel reached her about noon. The tide was then an hour ebb, and the water was about the same height inside of her and outside. A diver was sent down and the holes were stopped. A pump was then started about 4 o'clock P.M. The water had reached to within two feet of her upper deck. Some of her cargo was not wet. The cargo consisted of linseed in bags, gunny cloth, and saltpetre. She was pumped out by 9 o'clock P.M. After that she was kept free of water, and no more water reached her cargo. About half of her cargo was taken off by lighters. The ship was then taken to the city and the rest discharged. The ship could have been raised if she had sunk where she was anchored. The question of saving the vessel and cargo at either place was only a question of the expense of raising them. The wrecking bill was over $12,000, and would have been $30,000, if she had sunk where she was anchored. The defendants, on the 23d of January, 1867, signed "an average bond," whereby they agreed to pay as consignees of cargo, what should be found to be due from them, on their share of the cargo, for general average losses and expenses arising out of the transaction, provided such losses and expenses should be stated and apportioned by Johnson & Higgins, average adjusters, in accordance with the established usage and laws of the State of New York in similar cases. An adjustment was made by those persons, and they ascertained the balance due from the defendants to be $11,380.78, July 20th, 1867. The adjusters made no allowance to the defendants for the damages sustained by their cargo from the water which entered the ship, on the ground that such

damage was caused by water which entered through the holes made in the bows of the vessel by the ice, and, therefore, by a peril of the sea, and was not caused by the stranding, and was not a general average loss. The effect of the water upon the linseed in bags, as evidence showed, was greatly to swell it, and the ship was found to have been much strained vertically. The swelling of the linseed and the lying on the bottom at the place of stranding, together, started up the deck and strained and broke the beams and the straps over the beams.

The adjusters did not allow as a general average loss anything for any damage sustained by the ship from the swelling of the linseed, on the ground that such swelling was caused by water which entered through the holes in the bows from a peril of the sea, and, therefore, was not caused by the stranding; but they did allow, as a general average loss, the damage caused to the ship by laying on in what they inferred to have been an uneven bottom when she was stranded; inferring this from injuries of a certain kind, which the keel and keelson of the ship were found to have suffered, though some of the direct testimony went to prove that the bottom, like that of the place where the vessel had been anchored, was soft. The adjusters stated to the jury the ground on which the adjustment on this point was made. "We could not tell absolutely," they said, "what damage was caused by lying on the bottom, and what from swelling of the cargo, but we decided it as well as we could;" and the same witness described particularly the damages. The defendants called no witnesses to disparage the conclusions of the adjusters. The salvage expenses were put into general average. According to custom, one-half of the gross freight for the whole voyage was taken as the net freight to be contributed for.

The counsel for the defendants prayed the court to charge the jury as follows:

"*Fourth.* That if they found that the stranding or taking of the bottom was not a different one from what was originally im-

pending in consequence of the damage received from the action of the ice at the time the master determined to run or tow the ship into shallower water, but was a merely incidental and unsubstantial modification of such original stranding or taking of the bottom,—then the expenses incurred for repairing the damage to the ship, arising from her lying upon the bottom, were not the proper subject of a general average.

"*Fifth.* That, unless at the time the master came to the determination to run her upon the flats, there was a substantial and valuable chance that the ship might be kept from sinking where she was anchored, which chance the master voluntarily abandoned, the injuries sustained by said ship in consequence of lying upon the bottom are not a subject for general average.

"*Sixth.* That if the ship was, at the time the master came to his determination to run her upon the bottom in shallower water, so exposed to the injuries which she sustained from going upon and lying upon the bottom, that such injuries could not by any possibility or in any event be prevented, such injuries are not to be made good by a general average contribution.

"*Eighth.* That there is no evidence from which the jury can determine what particular repairs were rendered necessary by the ship lying on the bottom, and what were rendered necessary by the swelling of the cargo; and that as it appears that both these causes concurred in producing the injuries to the ship, one-half of such injuries should be deemed to have been occasioned by the one cause, and one-half of the other, as the nearest practicable approximation to justice.

"*Ninth.* That inasmuch as it appeared that all the freight on the cargo had been collected, and the disaster happening at the very entrance of the port of destination, such freight should contribute in general average upon its full value, after deducting such expenses, if any, as were necessarily incurred in order to earn it; and the jury should, in making up their verdict, so estimate the contributory value of freight."

But the court refused thus to charge, and charged.

"1*st.* That if the jury found that the ship and cargo were exposed to a common peril of sinking and becoming submerged in deep water, and that the expenses of raising and saving them from such place would have been greater than if stranded in

shoal water, and that the master, to save the ship and cargo from such increased expenses, ran the ship on the flats, and so stranded her in shoal water, and thereby increased the peril to the ship and diminished the damages and expenses of saving the ship and cargo—then, that there was a voluntary stranding within the meaning of the law, and that the plaintiffs are entitled to recover in general average their just proportion of all damages and expenses occasioned thereby.

"2d. That if they found that no water entered the ship which reached and damaged the cargo, except what came through the holes cut in the bows by the ice—then that the defendants were not entitled to be allowed anything for the damages to their cargo by water, by way of general average, or by way of reduction of the plaintiffs' claim, because such damages were not caused by or the result of the act of stranding the ship, but were caused by a peril of the sea which had overtaken the cargo before it was determined to strand the ship.

"3d. That the plaintiffs were entitled to recover in general average only those expenses which were caused by stranding the ship, not including any occasioned by damage to the ship through the swelling of the cargo caused by water which entered through the holes in the bows; and therefore, if the jury found that the ship was injured by such stranding and by lying on an uneven bottom, that the plaintiffs were entitled to recover the expenses for repairing such injuries, by way of general average; and that it was for the jury to determine from the evidence what such repairs amounted to.

"4th. That if, in respect to the contributory value of freight, they found that the adjustment, as made up by Johnson & Higgins, the average adjusters, was according to the usage and custom of the port of New York, and that no more had been allowed for damages to the ship than was attributable to the stranding—then that the plaintiffs were entitled to the amount stated in the adjustment to be due from the defendants to the plaintiffs as their general average contribution, with interest from the date of the said adjustment."

To all these instructions the defendants excepted.

The jury having found a verdict for the plaintiffs for $12,071.73, and judgment having been entered accordingly, the case was now here on error.

*Mr. J. C. Carter, for the plaintiff in error:*

I. There is no dispute as to certain principal facts.  They are these:

1st.  That at the time the determination was taken to put the ship on the flats, she was not simply exposed to a peril which seemed inevitable, but that the stroke had already fallen upon her; that she was already smitten with a death-blow proceeding directly from the action of the elements; that she was not simply in danger of sinking, but was actually sinking from the direct effect of the accidental injury, and that there was no power to save her from it.

2d.  That she continued sinking all the time after she started for the flats until she took the bottom upon them, having six feet of water in her when she started and ten when she struck the flats.

3d.  That she did not expect to encounter, and did not in fact encounter, any new peril in going upon the flats; that she was sinking to the bottom when she started; that she expected to sink and did sink upon the flats.

Upon these facts the conclusion follows, that the actual sinking or stranding was substantially the same sinking or stranding which was in progress under the direct action of the elements at the time of the voluntary resolution to run her upon the flats.  It was therefore an accidental and not a voluntary sinking or stranding.  All that could be done was to employ the time she should occupy in sinking to the best advantage.  All that was done was to move her while she was sinking, a space of some three hundred yards, to mitigate and abridge some of the disastrous results of a death-blow already received.  It was the master's duty, in the plainest and clearest sense of the term, to do the thing he did.  The instinct of self-preservation would have permitted him to take no other course.

The distinctions are decisive between the case at bar and those cases which have heretofore been held to be cases for a general contribution, where a vessel staunch and strong, and capable of contending with the winds and waves, and yet unsmitten by any deathblow from an accidental peril,

finds herself upon a lee shore and in apparently inevitable danger of being cast upon it; but still with a chance of escape, desperate though it be, and then concludes to abandon this chance and seek the most favorable spot on which to strand herself. In those cases the peril which was impending, however inevitable it might seem, had not in fact arrived. There was no accidental cause from the actual operation of which the injuries were received. They *seemed* indeed inevitable; but that they were absolutely certain could not be affirmed. There was nothing therefore to the direct action of which the damage could be with certainty attributed but the voluntary act.

The ordinary duty of the shipowner represented by the master is to navigate the ship, not to run her ashore. A claim for a general contribution cannot be founded upon any act of the master in the course of this ordinary duty. Shippers of goods have the right to all this. The presence of an overwhelming peril may make it best for the interests of all, treated as a unit to depart from mere navigation and strand the ship. This is something beyond what any one of the interests has the right to require of the ship, and is therefore outside of the ordinary duty of the master. The true foundation of the doctrine of a general contribution in cases of voluntary stranding lies in these considerations. But when, as in the case at bar, the actual operation of an accidental cause has, of itself, already put an end to the business of navigating the ship, all the master's ordinary duties are not at an end. It is still his duty to do all in his power to save what he may of the interests intrusted to his charge; and it cannot be pretended—when his ship is sinking and it is in his power to mitigate the consequences of such sinking by working his ship into shallower water—that it is not his duty to do so.

If these positions are true, the charge on the main point of the case—that is to say, the first instruction—was erroneous. It was based upon a direct denial of them. It made the question of liability for a general contribution turn entirely upon these three points:

1st. Whether the master ran the ship upon the flats for the purpose of diminishing the damages and expenses of raising and saving ship and cargo?

2d. Whether in so doing the peril to the ship was increased?

3d. Whether by so doing the damages and expenses of saving and raising the ship and cargo were diminished?

Now these inquiries might each be answered in the affirmative and yet the actual stranding be only an unsubstantial modification of the stranding or submersion originally impending. The point was distinctly made by the request to charge that the grounds of difference between the actual and the impending disaster should be substantial, but this element was disregarded by the judge. The error thus committed was this, that if a loss has been occasioned by the action of two concurring causes, one of which is a particular average cause and the other of which is a general average cause, the loss is to be taken as a general average, without any inquiry as to the respective degrees of efficiency with which these two causes may have operated, it being enough if the general average cause contributed in any degree to the loss. It is impossible to vindicate such a proposition.

But even if the proposition of the court below had, as a general principle of law, been sound, there was no evidence in the case warranting the submission of it to the jury. The court recognized the necessity of the condition that the peril to the ship should have been increased by the master's voluntary action, and made that a turning-point with the jury. But the only suggestion of any increase of peril was the claim by the plaintiffs below that the bottom where the ship actually took the ground was different from the bottom where she lay at anchor, it being uneven in the former place. Now the only evidence of this was conjecture. The lying upon a bottom of any sort and the swelling of the cargo were sufficient to account for all the injuries to the vessel, except that produced by the ice. The cargo was mainly flaxseed. It was proved that the effect of water upon this

article was to swell it. The ship, upon examination, was found to have been subjected to a vertical strain, pressing her decks and beams upwards with such force as to break the iron straps securing the beams to the stanchions. This must have been the effect of the swelling of the seed.

If the claim for a general average has any foundation, the damage to the cargo, or some part of such damage, must be contributed for. Nor would there be any serious difficulty in making the discrimination. When the master came to his determination to run the ship on the flats there were only six feet of water in her; after she had settled on the flats there were from twenty-two to twenty-six. It is ascertainable how much and what of her cargo was above, and how much and what was below the water in her when she left the spot where she was anchored.

The freight should be made to contribute at its full value. The rule adopted by the adjusters of taking it at one-half its value, when the whole was earned and received, is too unjust to prevail, unless it has some better warrant than custom. The custom alleged is well enough in the cases of voyages partly performed; but it is a rule touching customs that they must be reasonable. In cases like the present there seems to be no good reason why the freight should not be made to contribute at its full value. Especially should it be the case when, as here, the entire expense of bringing the cargo to the place of discharge was carried into the general average account.

*Messrs. E. H. Owens and S. P. Nash, contra:*

The instruction, chiefly complained of—the first—was in accordance with the law as well settled in the Federal courts.[*]

It is sufficient to make the act of sacrifice voluntary, that it is adopted as a matter of judgment, that upon deliberation

---

[*] Columbian Insurance Company *v.* Ashby, 13 Peters, 331; Barnard *v.* Adams, 10 Howard, 270; The Star of Hope, 9 Wallace, 203; Sturgess *v.* Cary, 2 Curtis, 59; Caze *v.* Reilly, 3 Washington, 298; Sims *v.* Gurney, 4 Binney, 513.

the will decides. It is none the less voluntary, that no other way of escape seems open. The idea of sacrifice in the law of general average is not that the property shall be doomed to certain loss, for the goods thrown overboard may have a fair chance of being recovered, or the vessel, which it is determined to run ashore, of being saved. It is the selection of one particular interest, of either vessel or cargo, to take a special, though it may be no greater, and be even a less, risk for the benefit of the whole, that makes the special loss or damage consequent upon the act vicarious. It is true, in this case, that but for the stranding the vessel would have gone down with the cargo, and true also that by stranding her the master may possibly have not subjected the vessel to any greater peril than she was in before. But the fact that he changed the peril from one to ship and cargo in common, to a peril to the ship alone, constituted a sacrifice in the legal sense. If any damage was in fact caused to the vessel by stranding, it is no answer to her claim for contribution to say that she would have been equally damaged by sinking. That the act of stranding was a benefit to the cargo is undisputed, and that it was also a benefit to the ship, only makes her claim less in amount than it would have been had she been lost by the act of stranding. She could only claim and has only been allowed the damages caused specially by the stranding, which was the voluntary and vicarious act, which saved the cargo from a heavier damage and expense.

The other exceptions relate to the sufficiency of the evidence, and are not available on writ of error. The seventh and eighth are of this sort.

But the rule is, that if there is evidence proper to be submitted to the jury it should be submitted. If the jury give too much weight to it the remedy is by motion for a new trial, which is not reviewable by writ of error.* The evidence showed that a careful discrimination by experts was made between the repairs. This might have been shown

---

* Schuchardt *v.* Allens, 1 Wallace, 359, 371.

to be weak had the defendants below called any witnesses to disparage it, but as they did not, the court properly left it to the jury.

Whether the ship lay on an uneven bottom or not was a question auxiliary merely to the determination of the question, whether certain damages were caused to the hull of the ship by the stranding. The testimony showed that experts finding the fastenings about the keel and keelson broken, and the vessel strained, attributed this to the vessel's lying on an uneven bottom. No objection was made to the giving of this evidence, and being in the case it was properly submitted to the jury.

There was no ground for asking to have the damages caused to the ship by the swelling of the cargo, and by straining, equally divided. There is no law for such a division, and no evidence was given to show its propriety.

The charge that if the jury found from the evidence that no water entered the ship which reached and damaged the cargo, except what came through the holes made by the ice, then that the cargo would not be entitled to any contribution for its damage, was manifestly correct. It was a question of fact how the damage to the cargo was caused. It seemed clear, from the evidence, that no water came to it except through the holes made by the ice before the stranding, and the defendants below cannot complain that the jury were left at liberty to find that some damage was done otherwise.

The jury, under instructions, found that the adjustment was made up according to "the usage and custom of the port of New York," which was proved to be to estimate for net freight and one-half the gross amount. The contract of the defendants below was to pay, if the adjustment should be made in accordance with such usage. No evidence was given contradicting that of the plaintiffs below as to the usage. The charge was, therefore, correct, and the ninth request properly refused. The general rule is, it is true, that it is the net freight which contributes. But how to ascertain the net freight is sometimes a difficult question, and

the rule of taking one-half the gross freight is not only customary in New York, and was, therefore, made the rule by the contract sued upon, but the rule has also been sanctioned by the court so as to have become a rule of law in that State.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Losses in a sea risk which give a claim to general average are usually divided into two great classes : (1) Those which arise from a sacrifice of part of the ship, or part of the cargo, purposely made to save the whole adventure from perishing. (2) Such as arise out of extraordinary expenses incurred, by one of the parties, in the course of the voyage, for the joint benefit of the ship and cargo.

Where two or more parties are engaged in the same sea risk, and one of them, in a moment of imminent peril, makes a sacrifice to avoid the impending danger, or incurs extraordinary expenses to promote the safety of all the associated interests, common justice requires that the sacrifice so made, or the extraordinary expenses so incurred, shall be assessed upon all the interests which were so exposed to the impending peril, and which were saved, by those means, from the threatened danger, in proportion to the share of each in the joint adventure.†

1. Bound on a voyage from Calcutta to New York, the ship Oneiza, with a valuable cargo of linseed, gunny cloth, and other merchandise on board, on the sixteenth of January, 1867, arrived off the latter port in a heavy gale, and in the evening of that day came to anchor inside the lower bay, being unable to proceed to the upper harbor in consequence of ice. Securely anchored, she remained there until the twenty-first of the same month, surrounded by ice and unable to proceed to her port of destination, when those in charge of her procured two steamtugs and caused her to be towed up through the Narrows into the inner harbor, and at seven o'clock in the evening of that day she came to anchor

---

\* Leavenworth *v.* Delafield, 1 Caines, 574.

† The Star of Hope, 9 Wallace, 228.

near the quarantine ground, abreast of Staten Island, in ten fathoms of water, where she remained during the night.

Throughout the night the watch were ordered to sound the pumps every hour, and the record shows that they found no more water in the ship than is usual under the circumstances, until the steamtugs made fast to her for the purpose of towing her up to the harbor, when it was ascertained that she had twenty-six inches of water in the well, and it was observed, within half an hour from that time, that the head of the ship was settling. Report of that fact was made to the master and he immediately directed that the pumps should be tried, and it was soon found that the ship had six feet of water in the hold, and that she was in imminent danger of sinking.

Efforts were made to keep her free, but it was found to be impossible to do so by her own pumps, or by any other means at command. Holes had been cut in the hull by the ice, and the master, finding that he could not stop the leaks, decided to run the ship ashore, as the best means of saving life and property and as the only means of preventing the ship from sinking in deep water. Directions to that effect were accordingly given to those in charge of the steamtugs, and with their assistance the ship was stranded on Staten Island flats, and it appears that when she grounded she had ten feet of water in her hold, the tide still rising, and that at high tide the water in the hold increased in depth to twenty feet.

Prompt assistance was procured and the ship was lightened by discharging part of her cargo into lighters furnished by the wrecking company, and on the first day of February following they succeeded in making the ship float, and she was immediately towed to her port of destination and the residue of her cargo was discharged.

2. Much of the cargo was saved, and the owners of the ship insisted that the owners of the cargo were bound to contribute for the sacrifices made by the ship and the expenses incurred by her owners in saving the associated interests from the dangers of the impending peril. Investiga-

tions became necessary before the parties could adjust the claim, and with that view the owners, shippers, and consignees of the cargo executed to the agent of the ship an average bond in which they designated the persons to be employed as adjusters, and covenanted and agreed to pay their respective shares of such proportion of the losses and expenses incurred as constitute, by the usage of the port, a general average, provided such losses and expenses were stated and apportioned by the average adjusters therein specified in accordance with the established usage and laws of that State in similar cases.

Pursuant to the terms of that bond the persons therein named were designated as the average adjusters, and they, after having heard the parties, charged to the cargo belonging to the defendants the sum of eleven thousand three hundred and eighty dollars and seventy-eight cents as a general average contribution in favor of the owners of the ship.

Unquestionably they proceeded upon the ground that the stranding of the ship was voluntary, but the defendants denied that the fact was so and refused to pay the amount. Whereupon the plaintiffs brought an action of assumpsit against them in the Circuit Court to recover the amount as adjusted, and the jury, under the instructions of the court, found a verdict in their favor for the whole amount charged by the adjusters to the owners of the cargo, with interest from the date of the adjustment. Exceptions were filed by the defendants to the refusals of the court to instruct the jury as requested, and also to the instructions given by the court to the jury, and the defendants sued out the writ of error and removed the cause into this court.

3. Complaint is made by the defendants that the question whether the evidence introduced in the case showed such a state of facts as entitled the owners of the vessel to claim a general average contribution from them, as the owners of the cargo, was not submitted to the jury under proper instructions.

Injuries, it is conceded by the defendants, had been re-

ceived by the ship before the master determined to run her upon the flats, and it is equally clear that those injuries, or some of them, were plainly attributable to the direct action of the ice, as contended by the defendants. Certain portions of her sheathing about the bows had been torn off and several holes had been cut through her planking—two or more on her port bow and one on her starboard bow—which caused the ship to leak. Doubtless these injuries preceded the stranding of the ship, but she received many more and such as were of a more serious character, by that act or as a necessary consequence of it, as is fully proved by the survey and the other evidence exhibited in the record.

Courts, as well as text writers, at the present day, agree that where the ship is voluntarily run ashore to avoid capture, foundering, or shipwreck, and she is afterwards recovered so as to be able to perform her voyage, the loss resulting from the stranding is to be made good by general average contribution, as such a claim is clearly within the rule that whatever is sacrificed for the common benefit of the associated interests shall be made good by all the interests exposed to the common peril which were saved from the common danger by the sacrifice.*

Authorities may be cited where it is held that if the ship is not saved an action for the claims cannot be maintained, but it is settled law in this court that the case is one for general average, although the ship was totally lost, if the stranding was designed for the common benefit and was voluntary, and it appears that the act of stranding resulted in saving the cargo.†

Repairs rendered necessary to the vessel by the ordinary perils of navigation, to enable her to prosecute her voyage to her port of destination, it is admitted, must be borne by the owners of the vessel, but the question whether the sacrifice made by the ship in a case where the ship, cargo, and

---

* McAndrews v. Thatcher, 3 Wallace, 365; Barnard v. Adams, 10 Howard, 270; 2 Arnold on Insurance, 784; 2 Parsons on Insurance, 241, 263; 2 Phillips on Insurance, 5th ed. 1313; Nelson v. Belmont, 21 N. Y. 38.

† Star of Hope, 9 Wallace, 232; Columbian Insurance Co., 13 Peters, 331.

all on board were in imminent peril, and the ship was voluntarily stranded to save the whole adventure, constitutes a valid claim for a general average contribution, is not an open one in this court, if the cargo is saved by the sacrifice, and it is equally well settled that extraordinary expenses incurred in getting the ship off, if the effort is successful, fall within the same rule. Necessary repairs to complete the voyage are not within the rule as applied in this court, except to the extent that such repairs are required to replace such parts of the ship as were sacrificed to save the associated interests.

Viewed in that light, the claim of the owners of the ship rests upon the same foundation of justice and reason as that of the owner of the cargo, in a case where part of the cargo is thrown overboard to save the ship, cargo, and all on board. Decided cases may be referred to where the rule established by this court is questioned, but the rule, it is submitted, is both just and reasonable if it be correctly understood and properly applied.*

4. Special reference must be made to the charge of the court, as it is insisted that several of the instructions given to the jury are erroneous.

Speaking to the principal question in the case, the judge told the jury that if they found that the ship and cargo were exposed to a common peril of sinking, and becoming submerged in deep water, and that the expense of raising and saving the ship and cargo from that place would have been greater than if stranded in shoal water, and that the master, to save the ship and cargo from such increased expenses, ran the ship on the flats and stranded her in shoal water, and thereby increased the peril to the ship and diminished the damages and expenses of saving the ship and cargo, then there was a voluntary stranding within the meaning of the commercial law, and the plaintiffs were entitled to recover, as general average, their just proportion of such damages and expenses.

Tested by the principles already explained it is quite ob-

---

* Walthew *v.* Mavrojani, Law Rep., 5 Exch. 119; Moran *v.* Jones, 7 Ellis & Blackburne, 582.

vious that the instruction is correct, and that the defendants have no just ground of complaint. They think otherwise, however, and insist that the ship was actually sinking at her anchorage from the direct effect of the accidental injuries she had received by the ice, and that her condition was such that there was no power to save her within the meaning of the law of general average.

Suppose that her condition was such that she would have sunk if she had remained where she was, still it is clear that her buoyancy was not overcome, as it appears that she still floated, that her position was changed, and that she was successfully stranded in much shoaler water, and the jury have found that the stranding was voluntary, and that the effect was to increase the peril to the ship and to diminish the damages and expenses of saving the ship and cargo.

Assume that the facts were as the jury have found them to be, and it is clear that the case is one for general average contribution, as appears by the repeated decisions of this court. Such being the finding of the jury the defendants are without any remedy in this court. Their remedy, if any, was by a motion for a new trial in the court below.

Minute description of the circumstances attending the disaster is given in the protest, and there was other evidence in the case upon the subject sufficient to have made it the duty of the court to submit the whole question to the jury in the form in which it was submitted in the instruction under consideration.

Facts found by a jury cannot be re-examined in this court, and of course it must be assumed, in the further examination of the case, that the ship and cargo, as the ship lay at her anchorage, were exposed to a common peril of sinking in deep water; that the expenses of raising and saving them, if the ship had sunk there, would have been greater than if stranded in shoal water; that the master, to save the ship and cargo from such increased expenses, ran the ship on the flats, and stranded her in shoal water, and that the effect of that act was to increase the peril of the ship and to diminish the damages and expenses of saving the ship and cargo.

5. Evidently this view of the finding of the jury disposes of the main question in the case and leaves nothing open for decision except the question whether the instructions in respect to the extent of the liability and the principles of the adjustment were correct.

Extensive damage was done to the ship, but the defendants insist that it was not wholly done by the stranding, that it was partly caused by the swelling of the flaxseed, consequent upon its being wet, that the effect of the water upon the article was to swell it, causing a vertical strain upon the ship, pressing her decks and beams upwards and separating the beams from the stanchions. They accordingly requested the court to instruct the jury that there was no evidence in the case from which the jury could determine what repairs were rendered necessary by the stranding, and that inasmuch as it appeared that both of those causes concurred in producing the injuries to the ship they should assume that one-half was occasioned by each, which the court very properly declined to give, as there was not sufficient evidence in the case to warrant the jury in finding that the estimate made by the adjusters was incorrect.

Whether the cargo was damaged by the stranding or by the antecedent peril of the sea was certainly a question of fact for the jury, and upon that subject the jury were told that if they found that no water entered the ship, which reached and damaged the cargo, except what came through the holes cut in the bows by the ice, then the defendants were not entitled to be allowed anything as general average for the damage to their cargo by water, as in that state of the case the damage to the cargo was the result of the prior peril and not of the act of stranding. Such damages, it is conceded, are not the subject of general average, and as the jury found for the plaintiff further examination of that exception is unnecessary.

Objection was also taken by the defendants to the adjustment submitted by the persons designated in the average bond, and upon that subject the jury were told that if they found that the adjustment in respect to the contributive

value of the freight, as made out by the adjusters, was according to the usage and custom of the port, and if they found that no more had been allowed for damages to the ship than was attributable to the stranding, then the plaintiffs were entitled to their verdict for the amount stated in the average adjustment; with interest from its date.

Framed as that instruction was in precise conformity with the stipulations of the average bond it is impossible to regard it as erroneous, which is a sufficient answer to the exception.

Suffice it to say, without giving a separate examination to each one of the numerous exceptions, that we are all of the opinion that there is no error in the record.

                                        JUDGMENT AFFIRMED.