NORWICH & N. Y. TRANSP. CO. v. INSURANCE CO. OF NORTH AMERICA. SAME v. SECURITY INS. CO. SAME v. FIRE-MEN'S FUND INS. CO. SAME v. CHUBB et al.

(District Court, S. D. New York. November 3, 1902.)

1. SHIPPING—GENERAL AND PARTICULAR AVERAGE—PROXIMATE CAUSE OF LOSS.
   If a maritime loss follows as a natural or inevitable result of the original and involuntary cause of danger, then such original cause should be regarded as the proximate cause; but when a voluntary act intervenes, which in itself is a cause of loss, such act being substituted for the original danger of loss with a design of saving, the substituted act should be regarded as the proximate cause for general average purposes.

2. SAME—VOLUNTARY STRANDING.
   After a steamer had struck on a rock causing a serious leak forward and danger of her sinking, the master, in preference to running her upon the rocks in the vicinity, took her some distance, and beached her on what he supposed to be a sandy beach. Contrary to his expectation, the bottom was of soft mud, and the bow stuck in the mud and settled until the vessel sank, and the main deck, on which was the cargo, was submerged, and the cargo damaged. Had the bottom been of sand as supposed, so as to lift and sustain the bow, the vessel would probably have remained afloat, or at least with her deck above water. Held, that the loss was attributable to the attempted salvage as the proximate cause, and was a subject for general average.

---

¶1. General average, see note to Pacific Mail S. S. Co. v. New York, H. & R. Min. Co., 20 C. C. A. 357.

In Admiralty.
Butler, Notman, Joline & Mynderse, for libellant.
Black & Kneeland, for respondents.

ADAMS, District Judge. These actions were brought by the libellant against the respective respondents to recover proportions of losses of particular and general average under policies of marine insurance covering certain risks upon the libellant's steamer City of Worcester, which was operated by it as a passenger and freight steamer on a line between New York and New London, Connecticut. The steamer left the latter place at about midnight on the 28th day of May, 1898, bound to New York by way of the Thames river and Long Island Sound. As she was passing from the river into the Sound, going at full speed, she ported to pass a tow and, getting too far to the westward, struck upon and passed over a rock, known as Cormorant Rock, which tore out a part of her forward bottom. She was found to be leaking too badly for control by her pumps and being in danger of sinking, was turned around under reduced speed until she obtained a direction towards a beaching place, when her engines were put at full speed again and she was run ashore upon some soft mud near Green's Harbor on the westerly side of the river, not far from New London. At the time she went ashore, no damage had been sustained by the cargo, which was carried on the main deck. The steamer gradually settled in the mud and the water subsequently reached the cargo. Assistance was sent for and by the use of another steamer, some tugs and lighters, her passengers and cargo were transferred and the leaks in her bottom having been stopped, she was pumped out and brought to New York, where she was placed in dry-dock and repaired. The cargo, which was badly damaged by water, was also brought to New York in lighters and upon recommendation of the surveyors was sold at auction. The matter was then placed in the hands of average adjusters and it was found that the total losses and expenses arising from the accident, amounted to $157,207.07, of which $32,780.14 was treated as particular average and $125,426.93 as general average. The items of loss or expenses making up this aggregate are not criticised or questioned by the underwriters but merely the correctness of the division or apportionment into particular or general average, the underwriters contending that the damage resulting from the submerging of the cargo and main deck of the steamer should be charged as particular and not as general average. It is admitted by the underwriters that if the stranding were the proximate cause of the loss, that it should fall under general average and be contributed to by the vessel, but it is urged that the striking upon the rock, not the stranding, was the proximate cause, and the cargo for that reason should not be entitled to contribution.

The difficulty arises in the application of the maxim "Causa proxima non remota spectatur" to a case of general average. The primary or original cause of the disaster was obviously not the stranding and if the case is to be decided thereby, no room exists for discussion. The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234. The doctrine of general average, however, is a peculiar one and its applica-

tion does not seem to be concluded by the primary cause of the loss but is rather dependent upon what occurred in the effort to save property. All cases of general average arise originally from some maritime peril and the peril instead of destroying the doctrine is the foundation of it. The sacrificial act, which brings the doctrine into operation, and the success, which ensues in the saving of property, are the proximate bases for a contribution to the sacrifice. If the vessel here instead of striking a rock had upon reaching the Sound encountered a sudden and violent storm or got into collision, in which she was so injured that she necessarily turned back and sought the beach to avoid sinking in the harbor for the benefit of the associated interests, it could not be successfully contended that there could be no general average on the loss occasioned by the stranding because of the previous storm or collision peril (Hobson v. Lord, 92 U. S. 397, 403, 404, 23 L. Ed. 613; Barnard v. Adams, 10 How. 270, 302, 13 L. Ed. 417), and there is no practical difference in principle because the vessel struck a rock, except so far as the striking upon the rock admitted water into the vessel which is directly connected with the loss. It is urged that the striking upon the rock must be the proximate cause of the loss because if the vessel had not turned around she would have sunk in deep water and there could consequently be no other cause of loss than the accident, but, to my mind, the suggestion lends force to the argument that the original danger of loss was not necessarily the proximate cause of the loss that occurred but that the latter may have originated with the attempt to save. If a loss follows as a natural or inevitable result of the original and involuntary cause of danger, then such original cause should be regarded as the proximate cause (Fowler v. Rathbones, 12 Wall. 102, 120, 20 L. Ed. 281), but when a voluntary act intervenes, which in itself is a cause of loss, such act being substituted for the original danger of loss with a design of saving, then it would seem that the substituted act should be regarded as the proximate cause for general average purposes. Otherwise there can be no general average recovery in cases of sacrifice to avoid the effects of the original danger. It is too well established for discussion, for example, that damage caused by masts being cut away in the stress of a storm is part of a general average loss (14 Am. & Eng. Enc. Law [2d Ed.] 966, 967), which would not be the case if the storm and not the act of sacrifice were regarded as the proximate cause of the loss.

Assuming the correctness of the foregoing statement of general principles governing this class of cases, it remains to ascertain the particular facts of this case in order to determine the proper application of the law.

There is no conflict in the testimony as to what took place when it was determined to beach the vessel. Two alternatives then presented themselves to the master. One was to run the vessel upon the rocks in the vicinity of the accident and the other to adopt the course he pursued. It was recognized that the vessel was badly injured but investigation showed that she could probably be kept afloat long enough to reach the beach, as was found to be the case. The master, however, was under a misapprehension as to the nature of the beach. Above the water it was hard sand and he concluded

that the sand extended far enough under the water to afford a firm resting place for the vessel, so that her cargo would remain uninjured, but it turned out that below the part of the beach which was in sight, there was a bed of soft mud. When the beach was reached, the steamer was about a foot more by the head than she was before striking the rock, owing to the influx of water through the holes in the bottom, but the engineer had been able to close the gates in a bulkhead abaft the engine room, so that notwithstanding the injury she had received, there were several water tight compartments under the main deck of considerable dimensions intact and it is probable that she would have remained afloat if she had lifted or been sustained at the bow, instead of sinking into the mud. When she first went ashore, her main deck was several feet above the water, but her bow gradually settled in the mud so that in a few hours these compartments were filled by water flowing in over the main deck and she then sank. The water eventually reached a height of about five feet above her main deck. This was at high water. The rise of the tide was not however sufficient to cause the ultimate sinking. The rise of the tide from low water was only from two and a half to three feet and as the steamer went ashore between 12 and 1 o'clock A. M. and the tide was high at 3:18 A. M., the rise during the latter part of the run of the tide being less than the first part, the tide would not of itself have overcome the margin of safety from further immersion which would have existed if the bottom had been the unyielding sand the master expected to find. Instead of the vessel lifting forward, as the master expected, the bow ploughed in the mud and not only remained stuck there but sunk further and further into it, probably stopping some of the leakage through the holes in the bottom but holding the vessel and subjecting her to complete submersion to the extent stated. The result of the sinking was that the cargo was damaged to the extent of over $100,000. There was also some additional damage to the hull by reason of the submersion. What would have occurred with respect to damage to cargo if the master instead of seeking the beach had grounded his vessel upon the rocks in the vicinity of Cormorant Rock can only be conjectured. It probably would have been more injurious to the hull and assuming the absence of any storm during salvage operations (which, owing to the exposed position the vessel in such event would have taken, might have frustrated the salvage enterprise and caused a greater, or perhaps total loss of the property) and the saving of cargo without injury, the cargo would certainly have been obliged to contribute to the loss on the hull. The other alternative having been adopted, in the exercise of the master's best judgment, why, in the application of the equitable principles governing general average, should not the cargo be entitled to recover for its resulting loss? It is immaterial that the master did not find the kind of bottom he expected. In endeavoring to find benefit for all the interests under his care, the effect is the same for general average purposes, notwithstanding the unexpected result of his effort. Lown. Av. 131, 132. In Rea v. Cutler, 1 Spr. 135, 20 Fed. Cas. 344 (No. 11,599), Judge

Sprague, referring to Insurance Co. v. Ashby, 13 Pet. (38 U. S.) 331, 10 L. Ed. 186, said:

"The principle of law laid down in that case appears to be, that where loss by shipwreck is inevitable, but may be met in more than one way, and with different degrees to peril of life or property,—where, in short, an election remains open to the master, and he acting for the interest of all concerned, exercises his volition, and adopts that one of the several courses which seems to him least perilous, and most conducive to the common benefit, and in so acting the ship is wrecked, the loss is a ground for general average, to which the property preserved must contribute. The volition and election of the master, is the essential inquiry, and the degree of injury sustained by the vessel is unimportant.

"In this case, there was a chance that the anchors might have caught a rock, and have held the vessel. There was an election on the part of the master to take this chance, or to slip the cables and run on shore; and in making this election, he exercised his volition."

The case of Fowler v. Rathbones, supra, is relied upon by the respondents to establish their contention. There the ship Oneiza, while at anchor in the harbor of New York, was found to be settling by the head from the effects of injury to her bows by floating ice. Attempts to free her from water by her pumps were ineffectual and the master caused her to be towed to shoal water on the Staten Island flats, where she was grounded. The owners of the ship brought action against the consignees and owners of the cargo to recover in general average for losses and expenses incurred in consequence of an alleged voluntary abandoning of the ship. The cause came to trial before the court and a jury and the court charged the jury, inter alia, as follows (page 107, 12 Wall., 20 L. Ed. 281):

"2d. That if they found that no water entered the ship which reached and damaged the cargo, except what came through the holes cut in the bows by the ice—then that the defendants were not entitled to be allowed anything for the damages to their cargo by water, by way of general average, or by way of reduction of the plaintiffs' claim, because such damages were not caused by or the result of the act of stranding the ship, but were caused by a peril of the sea which had overtaken the cargo before it was determined to strand the ship."

The case was reviewed by the Supreme Court and affirmed. It is an authority for the proposition that if as a matter of fact the water entering the ship were a direct and necessary result of the original injury from a sea peril, there could be no allowance to the cargo therefor in reduction of the ship owners' general average claim due to the stranding, and applying it to this case, that if the cargo here were directly damaged by water entering the ship through the holes in the bottom caused by the striking of the rock, and without loss in any respect from the subsequent stranding, it should not be entitled to recover its loss by way of general average, but it is not an authority to prevent recovery upon a different state of facts. Apart from an effort to save the property here, no doubt the holes in the bottom would eventually have caused a loss not recoverable in general average, but an attempt to save the property intervened and by such intervention the steamer was placed in a position from which, at least, a different degree, if not kind, of loss occurred. It was not the same loss. With the attempt to save the property, all involved in the

enterprise became subjected to danger from the beaching, which was a different hazard from that which would have existed without the attempt, and all the property interests were thus associated, with reciprocal relations, in the success of the enterprise. The result was that there was a general saving of property, though with the losses in question. Such losses can not be traced directly to the primary peril as in the Oneiza but should be connected, under the circumstances of the case, with the stranding and thus be brought into general average. The adjustment is sustained.

Decrees for libellant for the sums in controversy, after deducting payments made since the institution of the actions, with interest. Decrees to be settled on notice.