**TAMPA TUGS AND TOWING, INC., etc.,**
Libelant,

v.

**M/V SANDANGER, etc., Respondents,**
Smith-Rice Derrick Barges, Inc., Libelant in Intervention, Sigurd Haavik et al., Libelants in Intervention, James U. Kimball, Libelant in Intervention.

**UNITED STATES of America,**
Libelant,

v.

**M/V SANDANGER, etc., Respondents,**
Calcot, Ltd., et al., Claimants.

Nos. 3066–SD, 3072–SD.

United States District Court
S. D. California, S. D.

April 13, 1965.

Manuel L. Real, U. S. Atty., John F. Meadows, Atty. in Charge, West Coast Office, Admiralty & Shipping Section, Dept. of Justice, by LaVerne E. Evans, Sp. Atty., San Francisco, Cal., for libelant United States.

Graham, James & Rolph, by Reed M. Williams, Long Beach, Cal., and Dewey R. Villareal, Jr., Tampa, Fla., for libelant Tampa Tugs & Towing, Inc., and others.

Overton, Lyman & Prince, by Dan Brennan, Los Angeles, Cal., for James U. Kimball, owner of Tug Mikimiki.

McCutchen, Black, Verleger & Shea, by Howard J. Privett, and Sheldon A. Gebb, Los Angeles, Cal., for certain cargo interests.

Derby, Cook, Quinby & Tweedt, by James A. Quinby, San Francisco, Cal., for certain cargo interests.

MacNulty & Hulden, by Richard P. MacNulty, San Diego, Cal., for San Diego Marine Const. Co. and William C. Miller.

Bodle & Fogel, by Daniel Fogel and Arnold Kessler, Los Angeles, Cal., for libelants in intervention Sigurd Haavik and others.

KUNZEL, District Judge.

This is a consolidated proceeding in rem against the M/V SANDANGER and her cargo based upon salvage and maritime claims for services performed following the fire which occurred on the vessel off the coast of Baja California on May 18, 1964.

The Norwegian freighter, M/V SANDANGER, of 5,628 gross tons, carrying ten passengers and valuable cargo, was bound for Europe from California via the Panama Canal when, on May 18, 1964, she caught fire about 350 miles south of San Diego, California.

The fire aboard was of such intensity that a number of lives were lost and all survivors abandoned the vessel.

At 1530 hours on May 18th the tug SEA EAGLE, owned by libelant Tampa Tugs and Towing, Inc., which had been southbound for Florida without a tow, via the Panama Canal, arrived at the disaster scene in response to a distress signal received at about 0850 hours the same day.

About 0900 hours on May 18th, Captain Sigurd Haavik, master of the tug MIKIMIKI, which is owned by the cross-libelant James U. Kimball, called Kimball requesting advice as to whether to proceed to the rescue of the SANDANGER. The MIKIMIKI was northward bound, also without a tow, and about 200 miles north of the SANDANGER when she received the distress signal. Captain Haavik was told to stand by until further information was obtained. Immediately thereafter Kimball contacted agents of the owners of the SANDANGER in an attempt to secure a contract for the towage of the SANDANGER. Such a contract was not forthcoming. Kimball was told the vessel probably could not be saved and that anything he did would have to be on a "no cure, no pay" basis.

At about 1500 hours on May 18th Kimball talked to Captain Haavik and told him that the tug could proceed in an attempt to salvage the SANDANGER but only if the members of the crew were willing to go off wages. The crew agreed, and the MIKIMIKI turned about and rendezvoused with the SEA EAGLE at 1800 hours on May 19th. The masters of the two tugs agreed to cooperate in attempting to salvage the burning vessel.

It was observed by the crew of both tugs that the fire aboard the SANDANGER was burning fiercely in the vicinity of all hatches, and periodic explosions were seen and heard. The tugs circled the SANDANGER and covered the area about the vessel looking for survivors.

On May 20th it was decided by the masters of both tugs that, because of the rough seas and the heat emanating from the SANDANGER, it was not feasible to attempt to bring her under tow. At a later conference between the masters on board the SEA EAGLE on the same date, it was agreed that an attempt would be made to take the SANDANGER under tow during the early hours of May 21st when calmer seas could be expected.

At about 0700 hours on May 21st the two tugs approached the SANDANGER, and the MIKIMIKI put her bow against the port side of the SANDANGER aft of the forecastle deck. By pre-arrangement, Lawrence Gerald Drouillard, a deck hand from the MIKIMIKI, was to jump aboard the SANDANGER to determine whether she was too hot to board. This he did. Following Drouillard's determination that she could be boarded, Kermit Taylor and Charles L. Roberts of the SEA EAGLE boarded by jumping from the MIKIMIKI to the SANDANGER. These men testified that the deck of the SANDANGER was quite hot and they could hear small explosions coming from the No. 2 hatch. There was also considerable smoke. The men aboard the SANDANGER threw a heaving line to the SEA EAGLE which in turn was tied to a tag line and the tag line in turn tied to a towing cable by the crew of the SEA EAGLE. The towing cable was hauled aboard the SANDANGER by the three men with considerable physical exertion. The cable was then secured to the starboard bollard on the forecastle deck and let out through the starboard chock. The cable was then picked up by the MIKIMIKI and attached to its tow line. A second cable was pulled aboard the SANDANGER in the same manner and this was attached to the port bollard and let out through the port chock. This cable was picked up by the SEA EAGLE and was attached to its towing line. The entire operation was accomplished between 0700 and 1040 hours. The three men who boarded the SANDANGER were on board about two hours.

The tow commenced at 1040 hours. The SANDANGER had a port list of about 10° and her rudder was frozen to port. This condition required the MIKI-

MIKI to carry her towing cable over her port railing and tow at an angle while the SEA EAGLE towed almost straight ahead. Captain Haavik, who was familiar with the route, did the navigating and followed a course fairly close to the shore line in order to avoid rough seas and to save time. Both masters testified that the tow was difficult and somewhat hazardous because of the danger of the tugs getting "in irons" and the danger of the SANDANGER capsizing and tripping the tugs. The average speed of tow was about 4 knots. The list of the SANDANGER gradually increased to about 25°, and the fire on board increased in intensity.

The vessels arrived at an anchorage off Coronado, California, at 1610 hours, May 26th. This anchorage was in the open sea about one-fourth mile off the beach.

Prior to the arrival of the SANDANGER at Coronado, Kimball had a conversation with William Miller, a marine surveyor, concerning salvaging the SANDANGER and her cargo. The terms of employment established by the conversation are in dispute, Miller claiming it was on a "no cure, no pay" basis, and Kimball claiming it was to be for reasonable value. However, it is unnecessary to resolve this dispute in this proceeding inasmuch as the cargo owners were not parties to the agreement.

Before the arrival of the vessels at Coronado, Kimball and Miller commenced negotiations with the Navy, seeking to have the Navy use its equipment and men to exinguish the fire on the SANDANGER. Negotiations were also commenced with the Coast Guard and representatives of the Port of San Diego, seeking permission to bring the vessel into San Diego harbor.

The Navy consented to fight the fire upon being guaranteed its expenses. Some contention is made by claimants that the evidence would support a finding that the Navy agreed to waive salvage rights. However, the finding will be adverse to this contention.

Between 1610 and 1920 hours on May 26th two Navy YTBs poured water on the SANDANGER without any success in extinguishing or abating the fire.

On May 26th Tampa Tugs and Towing, Inc., as libelant in behalf of itself and the crew of the SEA EAGLE, filed the instant libel. Pursuant to libelant's instructions, a deputy United States marshal and a keeper boarded each of the tugs whose tow lines had remained connected to the SANDANGER, at about 0120 on May 27th, and served each of the masters with a copy of the libel, the monition issued thereon, and a notice of the seizure. At that time it was impossible to board the SANDANGER for the purpose of posting because of the hazardous condition which existed on the vessel. It was also, of course, impossible to put a keeper aboard. The keeper remained on board the SEA EAGLE until 2330 hours on May 27th when upon instruction from the deputy United States marshal he left without being relieved by another keeper. The deputy marshal relieved the keeper when he was advised by Government counsel that there had not been a valid seizure.

At about 1010 hours on May 27th, pursuant to instructions from Messrs. Miller and Kimball, the SANDANGER was intentionally grounded by the two tugs on the Coronado Strand. Thereafter the SEA EAGLE gave up its tow.

Between 1800 and 2230 hours on May 27th the Navy YTBs again poured water on the SANDANGER. The YTBs returned at 0545 hours on May 28th and between that time and 2230 hours on the same date the fires were extinguished by a large number of Navy enlisted men and officers who went aboard and used foam on the blaze. This undertaking was extremely difficult and hazardous for the men.

Between 1600 and 2300 hours on May 28th 175 bars of silver belonging to claimant American Smelting and Refining Company were removed from the SANDANGER. The silver was removed pursuant to court order and delivered to

the marshal. The stipulated salved value of the silver is $250,000.00.

At 1900 hours on May 28th, pursuant to an alias monition, the United States deputy marshal boarded and posted the SANDANGER. On May 29th the MIKIMIKI set the SANDANGER'S anchors and left the area.

On June 1st the court issued an order allowing James U. Kimball to remove cargo from the SANDANGER, and between that date and June 24th aluminum and copper valued at about $147,000.00 were off-loaded under the direction of Messrs. Miller and Kimball.

During this period various governmental agencies, including the Navy, were becoming concerned about the possibility of contamination of the beaches by oil escaping from the SANDANGER, which had in its holds approximately 100,000 gallons of bunker fuel oil. On June 22nd the Government, alleging that it was the lessee of the beach in danger of contamination by oil from the SANDANGER, filed an action against the owners of the vessel, Tampa Tugs and Towing, Inc., and James U. Kimball, seeking injunctive and declaratory relief. This action was never brought to issue.

On June 23rd, following a hearing, the court entered an order authorizing the United States Navy to deoil the SANDANGER. This order provided that the Navy's expenses, in an amount not to exceed $40,000.00, should constitute a maritime lien against the SANDANGER and cargo then aboard said vessel.

On June 26th a further order was made allowing the Navy to bring the vessel into San Diego harbor, reciting in part that the owners "of all cargo now aboard said vessel * * * are willing to subject said cargo to a * * * maritime lien" for expenses incurred by the Navy for both deoiling and towing the SANDANGER into the harbor, in a sum not to exceed $80,000.00.

On July 2nd the Navy moved the SANDANGER from the beach and towed her into San Diego harbor where she was moored to Navy buoys. Thereafter the balance of the aluminum and copper cargoes were off-loaded under the direction of Messrs. Kimball and Miller. All cargo, including the silver, was warehoused and later released to claimants who furnished either security or a stipulation.

Claimant Groupement D'Importation et de Repartition Des Metauz is the owner of copper bars having a stipulated salved value of $545,000.00.

Claimant L'Aluminum Francais is the owner of aluminum ingots having a stipulated salved value of $145,000.00.

Claimant American Smelting and Refining Company, in addition to owning the silver, owned copper having a stipulated salved value of $60,000.00.

On September 22nd, pursuant to court order, the SANDANGER and all cargo remaining on board was sold at a marshal's sale for $47,000.00. At a hearing prior to the sale there was testimony that the cargo remaining on board was valueless and that the cost of removing it as debris would be considerable. Claimants of cargo waived any rights to cargo on board the SANDANGER after September 8, 1964, by failure to remove the same in accordance with the court's order of August 28, 1964.

The owners of the SANDANGER neither appeared nor filed a claim, and on July 23rd the default of the owners and all others not appearing pursuant to the notice of the original libel and libels in intervention, was entered.

In addition to the various appearances heretofore noted, libels in intervention were filed by Smith-Rice Derrick Barges, Inc. for rental of equipment furnished to Kimball for use in off-loading cargo, the crew of the MIKIMIKI, and various owners of miscellaneous cargo not salved or recovered.

All parties stipulated that the amount of $45,000.00 was a fair and reasonable sum to be allowed Smith-Rice.

Of the expenses incurred by Kimball in off-loading the SANDANGER, including the Smith-Rice bill of $45,000.00, it was stipulated that $135,229.07 should be allowed, and that the sum of $8,161.58

as legal fees was reasonable and necessarily incurred by Kimball.

■ The disputed item in Kimball's claimed expenses is the bill of William Miller, the marine surveyor. Miller's original claim was $61,180.00. This he reduced at the trial to $52,350.00, which included claimed personal expense in the amount of $1,620.07. Miller, as noted before, based his claim upon a "no cure, no pay" basis, and contends that he should receive five percent of the net salved value of the ship and cargo for his services. He claimed to have spent 1,028 hours on the salvage operation. However, he testified that out of about 56 working days he spent 24 hours a day on the job for 33 of those days. While there is no doubt that he spent long hours on the job, full credence cannot be given to the implication that he went without sleep for so long a period. Basing his compensation upon the hourly rate testified to by one of the expert witnesses called, which was $15.00 per hour and $250.00 per day if more than an 8-working-hour day, Kimball will be allowed $11,350.00 for Miller's services, plus $1,272.97 for Miller's expenses.

■■ The expenses of the Navy for fighting the fire were stipulated to be $9,865.86. The Navy's salvage award claims for the crews of the YTBs, who rendered outstanding service, have been waived. Whether the Navy's claim is for a salvage award or for reasonable value of services rendered depends upon whether there was a valid seizure of the SANDANGER on May 27th, since the major and successful part of the Navy's services were rendered subsequent to that date. The holding will be that there was a valid seizure at the time the masters of the tugs were served since they had complete control over the SANDANGER and the latter vessel could not be boarded for the purpose of posting. The fact that the deputy United States marshal, absent instruction from the libelant or the court, relieved the keeper would not invalidate the seizure and court custody. The Rio Grande v. Otis, 90 U.S. (23 Wall.) 458, 23 L.Ed. 158 (1875).

■ The reasonable value of the services rendered by the Navy in fighting the fire is extremely difficult to measure as there were and are no other facilities available capable of performing these services. The benefit conferred was, indeed, extreme. Had the fire not been extinguished, the ship would more than likely have broken up, some of the valuable cargo been lost, and the cost of recovering the cargo far exceeded that which was actually incurred.

Some of the claimants contend that the Navy had a public duty to extinguish the fire and claim that the fire was extinguished only to protect the Navy beach which was being used for Naval amphibious operations. These contentions will not be upheld. The Navy will be awarded $25,000.00 as the reasonable value of services rendered. In fixing this amount consideration is given to the risk of injury or death to men involved which was shouldered by the Navy.

■ Kimball claims for his services in off-loading the cargo, ten percent of the net salved value of the cargo removed between June 1st and September 4th. Such an award, which would amount to approximately $75,000.00, is not justified. It is Kimball's contention that he worked on a "no cure, no pay" basis and should be compensated on that basis. This is not borne out by the facts. The nature and value of the cargo was known when he commenced work. There remained only a question of how much the cost of removal would be, and how much personal effort would be involved in the project. Mr. Kimball was never in danger of losing the moneys he advanced or the amount for which he became indebted to subcontractors and employees. There is no question that he did an outstanding job and that he achieved much. Kimball will be allowed a fee of $25,000.00, plus the sum of $2,000.00 to cover interest on money advanced and for any interest that Kimball may be liable for on debts incurred.

The stipulated expenses to be awarded the Navy for bringing the vessel into the harbor and for the deoiling operation is $60,410.49.

Claimants of cargo other than the silver contend that by reason of the voluntary grounding of the vessel the owner of the silver should, as in a general average situation, contribute to payment of the expenses in a deoiling and refloatation operation which was directed by Messrs. Miller and Kimball after May 28th and prior to June 26th. Claimants also contend that the silver should also contribute to payments of expenses incurred by the Navy in bringing the vessel into the harbor and deoiling it.

■ It is the general rule that where a voluntary grounding of a vessel is ordered by the master to avoid a greater disaster to cargo aboard, that cargo is required to contribute to the resulting cost of repair and refloatation of the vessel. Barnard v. Adams, 51 U.S. (10 How.) 270, 13 L.Ed. 417 (1850). See Rule V, York—Antwerp Rules (1950), 1949 A.M.C. 1683. The general average contribution by all cargo in a voluntary grounding situation is required even though some of the cargo may have been off-loaded before the vessel was refloated. Fowler v. Rathbones, 79 U.S. (10 Wall.) 102, 20 L.Ed. 281 (1870).

Counsel for silver interest cites Pacific Mail S. S. Co. v. New York, H. & R. Min. Co., 74 F. 564 (2d Cir. 1896), as holding that in case of a voluntary grounding where some cargo is removed and is no longer under control of the master, such cargo cannot be held for contribution. Although in the cited case there was a voluntary flooding of cargo holds for stabilization after an accidental grounding, the court treated the case as one of accidental grounding rather than as a case of voluntary grounding.

■ The question which arises here is whether the acts of Miller, Kimball, and the masters of the two tugs, in grounding the SANDANGER, created a general average situation. She was grounded without court order or authorization after the seizure of May 27th, heretofore held valid. None of the parties who acted had lawful possession of the vessel. Therefore, a general average situation could not be created. Ralli v. Troop, 157 U.S. 386, 15 S.Ct. 657, 39 L.Ed. 742 (1895). Robinson, Admiralty 772 (1939).

This holding obviates the necessity of ruling on the issue of whether claimants waived their right to raise the general average liability question as to the expenses of the Navy by presenting and approving the court orders of June 23rd and 26th.

■ In fixing the salvage awards, one of the most important items to be considered is the value of what was salved. The salved value of the cargo is $1,000,000.00, and the salved value of the vessel is $47,000.00. The allowances heretofore made of expenses incurred during the judicial seizure of the vessel and cargo for extinguishing the fire, off-loading the cargo, deoiling and moving the vessel, amount to $278,289.97. Thus, cargo will have to pay, in varying amounts, approximately the above sum, thereby reducing the net salved value of the cargo to approximately $730,000.00.

While the vessel sold for $47,000.00, the marshal's fees and expenses reduced the amount realized to $46,026.12, and although the vessel was abandoned by her owners, it became a potential liability to the salvors when the tow ended. Therefore, the net proceeds from the sale of the vessel shall be subject to a proportionate share of the expenses allowed for extinguishing the fire and deoiling and moving the vessel from its grounded position into the harbor. Thereafter, the entire balance of the proceeds shall be available for payment of salvage awards. The Gerbeviller, 34 F.2d 825 (D.Mass.1929).

■ In fixing a salvage award precedents are not helpful since the conditions under which salvage operations are undertaken are so varied that valid comparisons are impossible.

There is no question that the salvage operation here was of high order. The crew members who boarded the vessel on May 20th displayed raw courage. The maneuvering of the tugs to bring the vessel under tow showed excellent seamanship, and the navigating of the tow by Captain Haavik was outstanding.

Some contention is made that one tug could have accomplished the same result. This argument is not worthy of much consideration. It would have taken one tug at least twice as long to have effected the tow. Thus, it would have taken twelve days instead of six to complete, and it is the court's considered opinion from evidence adduced that in such event the probabilities are that the SANDANGER would have broken up or capsized before arrival. The court can take judicial notice that between the point of the commencement of the tow and San Diego there is no Mexican port which had any facilities capable of fighting the fire which raged aboard the SANDANGER.

The elements which a court should take into consideration in fixing salvage awards are set forth in The Blackwall, 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1870). These elements have been heretofore discussed with the exception of the valuation of the tugs. It was stipulated that the MIKIMIKI was of a value of $150,000.00, and the SEA EAGLE $100,000.00. However, it was tacitly agreed by the owners of the MIKIMIKI and the SEA EAGLE that the award for the tugs should be equally divided.

One of the best articulated expressions relative to fixing a salvage award is contained in The General Hubbard, 255 F. 854, at page 856 (9th Cir. 1919):

" * * * salvage is both compensation and reward, and while it should not be extravagant, or such as to excite greed, it should be liberal, to encourage prompt, energetic, and efficient service in the relief of vessels in peril."

Having taken into consideration all of the facts and circumstances, and the above admonition, the total salvage award is fixed at $125,000.00, to be divided as follows:

| | | | |
|---|---|---|---|
| 1. | Expenses of the MIKIMIKI | | $ 4,260.00 |
| 2. | Expenses of the SEA EAGLE, including loss and damage to equipment | | 5,854.34 |
| 3. | To the master and crew of the MIKIMIKI— | | |
| | Sigurd Haavik, captain | $4,000.00 | |
| | Stanley Organista, mate | 2,750.00 | |
| | George L. Hudson, chief engineer | 2,750.00 | |
| | Sverre H. Lervik, assistant engineer | 2,250.00 | |
| | Albert F. Burke, deckhand | 2,000.00 | |
| | Lawrence G. Drouillard, deckhand | 4,000.00 | |
| | William E. Hughes, cook | 2,000.00 | 19,750.00 |
| 4. | To the master and crew of the SEA EAGLE— | | |
| | Carl S. Randles, captain | $3,500.00 | |
| | Charles L. Roberts, mate | 3,750.00 | |
| | Max Merritt, chief engineer | 2,750.00 | |
| | Homer Byard, assistant engineer | 2,250.00 | |
| | Kermit R. Taylor, deckhand | 3,000.00 | |
| | Marcus M. Dykes, deckhand | 2,000.00 | |
| | Peter Sotire, cook | 2,000.00 | 19,250.00 |
| | | | $49,114.34 |

The balance of the $125,000.00 ($75,-885.66) is to be divided equally between the owners of the MIKIMIKI and the SEA EAGLE. However, the share of the MIKIMIKI is to be reduced by $7,-000.00, which amount shall be divided equally between the master and the crew of the MIKIMIKI. This additional amount is to be awarded to the crew of the MIKIMIKI by reason of their agreement to forego wages during the salvage operation.

The attorney for libelant Kimball made the contention near the close of the trial that the agreement by the crew to forego wages during the salvage operations is invalid by virtue of the fact that there was in existence a collective bargaining agreement between the owners and the union representing the members of the crew. The cases cited in support of this contention are J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), and Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 64 S.Ct. 830, 88 L. Ed. 1007 (1944). While there is no doubt that the general rule is that the employer may not, where there is a collective bargaining agreement, exact from his employees a diminution of his obligation, there is a serious question as to the applicability of the rule to the instant situation. However that may be, it would be inequitable to enforce such a rule here and it is therefore held that libelant Kimball is estopped from making the contention.

Inasmuch as sufficient security is available out of which to pay all claims, the question of priority of payment between parties and the problems as to who has or does not have a lien, is of no importance. All claims for services which have been allowed and which were rendered for the benefit of the ship and cargo subsequent to the seizure on May 27th shall, by the decree, be ordered paid before distribution to the salvage award claimants. Turner & Blanchard, Inc. v. S.S. Emilia, 322 F.2d 249 (2d Cir. 1963).

Smith-Rice Derrick Barges, Inc. has no lien against the ship or its cargo, having rendered services during the seizure by virtue of a contract with Kimball. Probably Smith-Rice should look to Kimball for payment. However, since no one seems to contend otherwise, the decree shall provide for direct payment to Smith-Rice.

This memorandum of decision shall constitute the findings of fact and conclusions of law.

Attorneys for libelant Kimball are to prepare the decree in accordance herewith.

In the event all of the parties hereto cannot agree as to the provisions of the decree, the settlement of the decree may be set down for hearing by any of the parties to this proceeding.